Ryan Danks
Steven Kramer
Seth Grossman
Rebecca Perlmutter
U.S. Department of Justice Antitrust Division
1401 H Street, NW, Suite 4000
Washington, DC 20530
(202) 305-0128
    Attorneys for the United States

Terry Goddard, Attorney General
Nancy Bonnell, Antitrust Unit Chief, ID #016382
Consumer Protection and Advocacy Section
Department of Law Building, Room #259
1275 West Washington Street
Phoenix, AZ 85007-2997
(602) 542-7728
    Attorneys for the State of Arizona

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America and the State of Arizona,<br><br>    Plaintiffs,<br><br>v.<br><br>Arizona Hospital and Healthcare Association and AzHHA Service Corporation,<br><br>    Defendants. | CASE NO. CV07-1030-PHX<br><br>**COMPLAINT** |

**COMPLAINT**

1.     The United States of America, acting under the direction of the Attorney General of the United States, and the State of Arizona, acting under the direction of the Attorney General of the State of Arizona, bring this civil action to obtain equitable and other relief against Defendants Arizona Hospital and Healthcare Association ("AzHHA") and its subsidiary the AzHHA Service Corporation to restrain Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the State of Arizona seeks relief also under Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402.

# I. Introduction

2. AzHHA, through its subsidiary the AzHHA Service Corporation, runs the AzHHA Registry Program ("AzHHA Registry"), a group purchasing organization, which contracts with nursing agencies to provide temporary nursing services for most Arizona hospitals. Through the Registry, AzHHA and its participating member hospitals have jointly set prices and other terms governing the hospitals' purchases of per diem and travel nursing services.

3. For nearly ten years after AzHHA started the Registry in 1988, it focused on setting uniform quality standards for per diem and travel nursing personnel, and enforcing those standards through regular audits. During this time, AzHHA allowed each participating agency that employed per diem and travel nurses to set its own bill rates, provided that the agency offered the same rates to every hospital participating in the Registry. Since 1997, however, AzHHA has imposed the same bill rates on each participating agency, which the agency must offer each participating hospital.

4. Acting collectively on behalf of most of the hospitals in Arizona, AzHHA has set bill rates below the levels its member hospitals could otherwise have achieved by negotiating independently with each agency. AzHHA also has imposed other noncompetitive contractual terms on participating agencies.

5. Efficiencies do not explain or justify the Registry's conduct. Agencies have not obtained significant transactional efficiencies or scale economies as a result of the imposition of uniform bill rates by the Registry. The Registry's practice of imposing uniform bill rates has not been reasonably necessary to achieve any benefits, such as greater quality assurance. Neither agencies nor hospitals have acted as though the Registry's rate setting creates efficiencies.

6. Through this suit, the United States and the State of Arizona ask this Court to declare the Defendants' conduct illegal and enter injunctive relief to prevent further violations of the antitrust laws.

## II. Defendants

7. AzHHA is a nonprofit corporation existing under the laws of the State of Arizona and headquartered in Phoenix. The association describes itself as dedicated to providing leadership on issues affecting the delivery, quality, accessibility, and cost effectiveness of healthcare. Active members of AzHHA include more than 100 hospitals and health systems in Arizona. Executives from member hospitals control the AzHHA Board of Directors.

8. The AzHHA Service Corporation is a for-profit corporation existing under the laws of the State of Arizona and is a wholly owned subsidiary of AzHHA; it is also headquartered in Phoenix. The AzHHA Service Corporation runs the AzHHA Registry, which helps member hospitals purchase the services of temporary healthcare personnel, including per diem and travel nurses. Executives from AzHHA member hospitals control the AzHHA Service Corporation Board of Directors.

## III. Jurisdiction and Venue

9. The Court has subject-matter jurisdiction over this action under 15 U.S.C. § 4 and 15 U.S.C. § 26, which authorize the United States and the State of Arizona, respectively, to bring actions in district courts to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Subject matter jurisdiction also exists pursuant to 28 U.S.C. §§ 1331, 1337.

10. Venue is proper in the District of Arizona, under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) & (c), because the defendant corporations reside there.

11. The Court has jurisdiction over the State of Arizona's claim under the Uniform Arizona Antitrust Act, A.R.S. §§ 44-1402, *et. seq.*, under the doctrine of pendent jurisdiction, 28 U.S.C. § 1367.

## IV. Conspirators

12. Various firms and individuals, not named as defendants in this Complaint, have knowingly participated as conspirators with Defendants in the violation alleged in this Complaint, and have done acts and made statements in furtherance of the alleged conspiracy.

## V. Trade and Commerce

13. Arizona hospitals employ various types of nursing personnel to treat and care for patients. Hospitals are the primary employers in Arizona of registered nurses (RNs), who must graduate from an approved professional nursing program to obtain a license in Arizona. Specialty RNs are RNs who receive additional education and training and become certified to practice in a specialty unit, such as critical care, neonatal intensive care, or telemetry. Specialty RNs and RNs account for most of the nursing staff employed by Arizona hospitals. Besides RNs and specialty RNs, Arizona hospitals employ several other types of nursing personnel, including licensed practical nurses (LPNs), certified nursing assistants (CNAs), operating room technicians, behavioral health technicians, and sitters.

14. Arizona hospitals frequently cannot meet their nursing needs with their own regularly employed nurses. Hospitals cannot meet their needs because of, for example, temporary absences of the hospitals' regularly employed nursing staff, daily variations in hospitals' censuses, an influx of visitors to Arizona during the winter months, and a rapidly increasing population.

15. Most Arizona hospitals try to fill their needs for nursing services by having their regularly employed nurses work overtime and by using internal pools of employees who "float" among units as needed (and as qualified). Some Arizona hospitals also maintain their own in-house list of nurses who may be available to work at the hospitals temporarily.

16. These measures do not satisfy the hospitals' demands for nursing services. At such times, the hospitals will purchase the services of temporary nursing personnel through nurse staffing agencies. Temporary nursing personnel fall usually into two categories: per diem nurses and travel nurses.

17. Per diem nurses are typically local nurses who work on short notice to fill hospitals' immediate needs on a single shift. In contrast, travel nurses contract to work at hospitals for longer periods, usually thirteen weeks. Unlike per diem nurses, travel nurses generally live outside Arizona and receive short-term housing in Arizona while employed there. Arizona hospitals purchase the services of travel nurses to satisfy their demand for nursing services, including responding to the influx of seasonal residents, and covering planned absences of regularly employed nursing staff, such as those on maternity leave. Along with California, Florida, and Texas, Arizona hospitals have the highest demand for travel nursing services.

18. Nurse staffing agencies coordinate most placements of per diem and travel nurses with Arizona hospitals. Many nurse staffing agencies focus on providing either per diem or travel nurses. Arizona hospitals pay agencies an hourly bill rate for the work done by the agencies' nursing personnel. Agencies pass most of that bill rate directly to nursing personnel as wages and benefits, and allocate the balance to their overhead and profit. Temporary nurses' compensation is directly correlated to the bill rate paid by hospitals to nurse staffing agencies, and a decrease in temporary nursing agency bill rates results in lower compensation for temporary nurses.

19. Dozens of nurse staffing agencies work with hospitals in Arizona. Before the Registry, Arizona hospitals used to compete on price with each other to purchase temporary nursing services from nurse staffing agencies.

20. Some hospitals use third parties to coordinate their procurement of temporary nursing personnel from multiple nurse staffing agencies. Until 2004, the AzHHA Registry Program was the only major provider of such services in Arizona.

### VI. The AzHHA Nurse Registry Program

21. The AzHHA Registry operates separate registries for per diem nursing personnel in Northern Arizona (mainly Phoenix) and Southern Arizona (mainly Tucson), together called the "Per Diem Registry." The Registry also operates a registry for travel nursing personnel throughout Arizona, called the "Travel Registry." These registries cover

1   various types of nursing personnel, including RNs, specialty RNs, LPNs, CNAs, operating
2   room technicians, behavioral health technicians, and sitters.

3       22.    Since 2000, most of AzHHA's member hospitals have purchased services of
4   temporary nursing personnel through the AzHHA Registry. In 2005, 65 Arizona hospitals
5   participated in at least one part of the Registry. The hospitals then participating in the Per
6   Diem Registry controlled approximately 80 percent of hospital beds in the Phoenix area and
7   approximately 84 percent of hospital beds in the Tucson area. Hospitals then participating
8   in the Travel Registry controlled approximately 78 percent of all hospital beds in Arizona.
9   From May 2004 to May 2005, these hospitals purchased approximately 850,000 hours of per
10  diem nursing services (worth about $43 million) and approximately 2.3 million hours of
11  travel nursing services (worth about $116 million) through the AzHHA Registry.

12      23.    The AzHHA Registry began in 1988 with a focus on quality assurance. The
13  Registry seeks to provide quality assurance by establishing standards for agencies' temporary
14  nursing personnel and agencies' personnel record-keeping requirements. AzHHA employees
15  monitor the agencies' quality assurance through annual audits. These audits verify that each
16  agency properly maintains files on its nursing personnel's education, background, work
17  experience, skill level, and references.

18      24.    Hospitals participating in the AzHHA Registry commit to turn first to
19  participating agencies when purchasing temporary nursing services. If the participating
20  agencies cannot fill a participating hospital's needs promptly, then a hospital may purchase
21  services from a nonparticipating agency, provided that its total purchases of per diem nursing
22  services remain above 50 percent. Most participating hospitals have fulfilled this contractual
23  obligation and have purchased most of their temporary nursing services through the Registry.
24  Overall, participating hospitals have purchased about 70 percent of their per diem nursing
25  services through the Registry. The Travel Registry has accounted for about 90 percent of
26  travel nurse agency sales to hospitals in Arizona.

27      25.    The participating hospitals regularly meet to select agencies to participate in
28  the AzHHA Registry. In 2005, the participating hospitals selected approximately 80 different

nurse staffing agencies to participate in at least one part of the Registry, out of approximately 170 completed applications.

26. The AzHHA Service Corporation has collected an administrative fee from each agency based on the amount that each agency bills hospitals through the Registry. For per diem personnel, AzHHA has collected a flat 2 percent fee. For travel nurses, AzHHA has collected fees based on a tiered structure starting at 2 percent and decreasing to 0.5 percent, depending on the total amount an agency bills participating hospitals. The fees collected from the agencies fund the Registry and other AzHHA activities.

27. When the AzHHA Registry began, each participating agency submitted a set of standard bill rates that the agency agreed to charge all participating hospitals. Starting from the bill rates submitted by an agency, each hospital could then individually negotiate discounted bill rates with each agency.

28. In 1997, with the support of participating hospitals, AzHHA began collectively setting the rates agencies could bill hospitals through the Per Diem Registry. To do so, AzHHA began requiring all participating agencies to accept a uniform bill rate schedule, set by the Registry, for all participating hospitals. In 1998, AzHHA imposed a similar, uniform rate schedule for the Travel Registry.

29. The AzHHA Registry has formulated uniform nurse agency bill rates through a three-step process. First, AzHHA employees surveyed the bill rates from each participating agency, averaged the rates, and forwarded the averaged rate information to participating hospitals. Each hospital then provided its own desired agency bill rates to AzHHA. Finally, AzHHA set the uniform agency bill rates, based only on the average rates submitted by participating hospitals.

30. At the insistence of the CEOs of several participating hospitals, AzHHA employees sometimes prepared and circulated usage reports detailing hospitals' usage of per diem personnel though the Per Diem Registry, and outside it. The reports included estimates of the cost of hiring per diem personnel outside the Registry. In May 2002, participating hospitals agreed to expel any hospital using participating agencies for less than 50 percent

of its total per diem hours. This new rule affected six hospitals. Four hospitals responded by immediately increasing their use of participating agencies to at least 50 percent of their total per diem needs. One system, comprising two hospitals, chose to leave the Per Diem Registry rather than face expulsion.

31. In 2005, AzHHA altered the Per Diem Registry's rate structure by eliminating the bill rate differential between weekday and weekend shifts. In addition, AzHHA significantly reduced overtime and holiday bill rates. AzHHA made these changes over objections from many participating agencies. Several per diem agencies subsequently left the Registry.

32. AzHHA has taken other steps to further coordinate how participating hospitals deal with agencies. The AzHHA Registry contract requires participating agencies to accept certain competitively sensitive contract provisions relating to, among others, payment terms between participating hospitals and participating agencies, indemnification, and cancellation policies. AzHHA also gathers from and shares with participating hospitals competitively sensitive information such as bonuses offered to temporary nursing personnel.

33. In November 2006, while under investigation by the Plaintiffs and defending a private antitrust action, AzHHA reverted to its pre-1997 approach to pricing for the Per Diem Registry. It now requires each agency to submit bill rates that it will charge all participating hospitals. The revised pricing method applies only to per diem agencies, and AzHHA retains the right to reject an agency's rate submission. The Travel Registry continues to impose a uniform bill rate schedule applicable to all participating hospitals' purchases from travel nurse staffing agencies.

### VII. Interstate Commerce

34. The activities of the Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

35. The AzHHA Service Corporation has transmitted contracts to nurse staffing agencies across state lines and has communicated with nurse staffing agencies by mail and

telephone across state lines. AzHHA employees have traveled across state lines to audit nurse staffing agencies.

36. The Travel Registry contracts with agencies that arrange for nurses to travel from outside Arizona to provide temporary nursing services in Arizona hospitals.

37. Many AzHHA member hospitals that purchase services from nurse staffing agencies through the AzHHA Registry remit substantial payments across state lines to nurse staffing agencies. Nurse staffing agencies also remit substantial payments in the form of administrative fees across state lines to the AzHHA Service Corporation.

## VIII. Relevant Markets

*A. Hospitals' Purchases of Per Diem Nursing Services in the Phoenix and Tucson Metropolitan Areas*

38. Per diem nursing services is a relevant service market within the meaning of the antitrust laws.

39. Positions as regularly employed RNs at hospitals are generally not attractive alternatives for per diem nurses because they do not offer the scheduling flexibility or pay attractive to per diem nurses. Many per diem nurses work part-time as secondary wage earners for their families and highly value flexible work schedules. Per diem nurses generally are paid higher hourly wages compared to regularly employed nursing staff, but typically do not receive benefits such as health insurance or retirement contributions. Although some per diem nurses also work full-time at a hospital, many do not.

40. Nursing positions in non-hospital settings tend to pay even lower wages, are generally less prestigious, and usually offer less professionally challenging work environments than RN positions in hospitals. Thus hospital per diem nurse openings are generally more attractive than per diem nurse openings in other settings, such as in-home nursing visits or care, physician offices, freestanding outpatient care facilities, skilled-nursing facilities, schools, and prisons. Moreover, there are relatively few employment opportunities for per diem nurses in non-hospital settings.

41. The Per Diem Registry has collectively imposed per diem bill rates below competitive levels, and lowered the compensation paid to per diem nurses. Those reduced bill rates have not induced per diem nurses to stop offering their services in sufficient quantities to make the reduction in bill rates unprofitable. Purchases of per diem nursing services by hospitals is, therefore, a relevant service market. This service market aggregates, for analytic convenience, several relevant service markets, including hospitals' purchases of discrete types of temporary nursing services, such as per diem medical / surgical RN services, various per diem specialty RN services, per diem LPN services, and per diem CNA services.

42. The Phoenix and Tucson metropolitan areas are relevant and distinct geographic markets, within the meaning of the antitrust laws, for the purchase of per diem nursing services.

43. Phoenix and Tucson are distinct relevant geographic markets for the purchase of per diem nursing services in part because they are located about 120 miles from each other. Per diem nurses generally must live within a reasonable commute of the hospitals where they work to ensure their work is profitable and they are available on short notice. In Arizona, per diem nurses generally reside in either Phoenix or Tucson and live in the metropolitan area where they work. More distant hospitals are not good substitutes for per diem nurses living in the Phoenix or Tucson metropolitan areas.

44. The Per Diem Registry consequently has operated distinct purchasing programs centered in Phoenix and Tucson. Participating hospitals and per diem nurse staffing agencies have considered the Phoenix and Tucson metropolitan areas to be distinct markets for the purchase of per diem nursing personnel services, and the Registry has priced them differently.

45. The Per Diem Registry has collectively imposed per diem bill rates below competitive levels in Phoenix. Those reduced bill rates have not induced per diem nurses in Phoenix to stop offering their per diem services in Phoenix in sufficient quantities to make the reduction in bill rates unprofitable. Similarly, the reduced bill rates in Tucson have not

induced per diem nurses to stop offering their per diem services in that city in sufficient quantities to make the reduction in bill rates there unprofitable.

### B. Hospitals' Purchases of Travel Nursing Services in Arizona

46.   Travel nursing services is a relevant service market within the meaning of the antitrust laws.

47.   No other nursing position offers the benefits that travel nursing provides: temporary residence in a new or attractive area of the country, the ability to work near friends or relatives in the area, and the chance to try out a hospital for future long-term employment. Travel nurses usually earn a higher hourly rate than regularly employed nurses, and often receive health benefits and paid vacation from their agency. Many hospitals in Arizona also pay travel nurses through their agencies bonuses upon completion of their assignments.

48.   The Travel Registry has collectively imposed travel bill rates below competitive levels and lowered the compensation to travel nurses. Those reduced bill rates have not induced travel nurses to stop offering their services in sufficient quantities to make the reduction in bill rates unprofitable. Purchases of travel nursing services by hospitals in Arizona is, therefore, a relevant service market. This service market aggregates, for analytic convenience, several relevant service markets, including hospitals' purchases of discrete types of travel nursing services, such as medical / surgical RN services, and various specialty RN services.

49.   Arizona is a relevant geographic market, within the meaning of the antitrust laws, for the purchase of travel nursing services.

50.   Most of the thousands of travel nurses throughout the country have strong preferences for assignments in a particular location at any given time. A substantial number of travel nurses prefer Arizona over other warm-weather locations with high demands for travel nurses, such as Southern California, Texas, and Florida. Nurses prefer Arizona for any number of reasons, including previous work experience, preferred recreational opportunities, and proximity to friends and relatives. Also, Arizona, unlike California and Florida, is a member of the multistate Nurse Licensure Compact. This means that nurses licensed in

Compact states face lower transaction costs to provide services in Arizona, and incur higher costs when choosing Florida or California instead of Arizona for their thirteen-week travel assignments.

51. Travel nurse agencies' experiences in Arizona further corroborate that Arizona is a relevant market for travel nurses. Starting in 1998, the Travel Registry collectively imposed bill rates in Arizona lower than they would have been absent the Registry, while hospitals in comparable states continued to pay relatively higher bill rates. That change has had a significant negative effect on the margins of the travel nurse agencies and reduced somewhat the hourly wages those agencies paid to travel nurses working in Arizona. Despite the Travel Registry's adverse effects, travel nurse agencies have not been able to steer a sufficient number of travel nurses to other states to defeat the small but significant nontransitory decrease imposed by the Travel Registry on travel nurse billing rates in Arizona.

52. For instance, in 1998, one of the nation's largest travel nurse agencies, which provided a substantial number of travel nurses to AzHHA participating hospitals, withdrew from the Travel Registry in response to the collectively imposed bill rates. Because about 90 percent of travel nursing services sold by travel nurse agencies in Arizona are purchased by hospitals through the Travel Registry, the travel nurse agency was effectively shut out of Arizona hospitals. The agency found that it could not redirect nurses with a preference for Arizona in sufficient numbers to other states, and so lost business to other agencies. The travel nurse agency was ultimately forced to rejoin the Travel Registry and accept its collectively imposed bill rates.

53. The Travel Registry has collectively imposed travel bill rates below the competitive levels in Arizona. Those reduced bill rates have not induced travel nurses to stop offering their travel nursing services in Arizona in sufficient quantities to make the reduction in bill rates unprofitable.

## IX. Market Power

54. As of 2005, the Arizona hospitals that participated in the Per Diem Registry controlled approximately 80 percent of all hospital beds in the area in and around Phoenix and approximately 84 percent of all hospital beds in the area in and around Tucson. (The number of hospital beds serves as a proxy for the demand for nursing services.) As the dominant purchasers of per diem nursing services in the areas in and around both Phoenix and Tucson, the hospitals participating in the Registry possessed market power in those relevant markets.

55. As of 2005, the Arizona hospitals that participated in the Travel Registry controlled approximately 78 percent of all hospital beds in Arizona. As the dominant purchasers of travel nursing services in Arizona, the hospitals participating in the Registry possessed market power in that relevant market.

56. The high percentage of Arizona hospitals that participate in the AzHHA Registry has allowed the Registry to impose uniform rates and noncompetitive contract terms, despite objections from many large nurse staffing agencies in Arizona, because there are not enough alternative purchasers of per diem and travel nursing services to thwart AzHHA's exercise of market power. Indeed, the managers of the Registry have recognized that the "more [hospitals they] can bring into the program the more purchasing power [the hospitals] can have as a group." In communications to its member hospitals, AzHHA executives have "emphasize[d] the importance of functioning as a group," and stressed that the Registry's "strength lies in the group's ability to stay consistent in [its] purchasing decisions when contracting for agency nurses, including travelers."

## X. Anticompetitive Effects

57. Through the Registry, AzHHA and its participating hospitals have decreased prevailing wages for temporary nursing personnel below competitive levels.

58. By AzHHA's own estimate, the AzHHA Registry has forced agency bill rates below competitive levels. In communications to other state hospital associations and to its own member hospitals, AzHHA has admitted that participating hospitals paid much lower

bill rates for temporary nursing services than they would have paid absent the Registry. In advertising materials, AzHHA has estimated the bill rates its member hospitals paid agencies were as much as 12 percent lower than they would have been if agencies had been able to negotiate competitively with hospitals. AzHHA has reported to participating hospitals that the bill rates paid through the Per Diem Registry were 9 percent to 16 percent lower than they otherwise would have been. (The elimination of shift differentials and reduced overtime and holiday rates imposed since 2005 further lowered the effective per diem agency bill rates.) In its communications, AzHHA has reported similar savings, 7 percent or more, in the bill rate paid through the Travel Registry. In sum, AzHHA has estimated that participating hospitals lowered payments to nurse staffing agencies by 10 to 12.7 million dollars per year through the reduced bill rates provided by the AzHHA Registry. Notably, AzHHA has attributed these savings to its collective price-setting and not to any administrative or transactional efficiencies.

59. Hospitals have recognized that the AzHHA Registry forced agency bill rates below competitive levels. Indeed, multiple hospitals, including two of the largest hospital systems in Arizona, concluded that leaving the Registry would have forced them to pay much higher rates for temporary nursing personnel. Instances where participating hospitals have left the Registry confirm that hospitals usually have paid higher bill rates outside it. In the last two years, several hospitals have left the Registry and signed contracts with AzHHA competitors; the new contracts generally have included higher bill rates for agencies.

60. Temporary nurse staffing agencies in Arizona have observed that AzHHA forced bill rates below competitive levels. Agencies that were not part of the Registry, including several former participating agencies, have received higher bill rates from hospitals through arrangements outside the Registry. A comparison of per diem rates done several years ago by AzHHA showed that the bill rates paid by AzHHA hospitals to agencies operating outside the Per Diem Registry ranged from 5 percent to 40 percent higher than the Registry's rates. Still, many agencies have continued to participate in the Registry because they feared that failure to do so would effectively exclude them from the Arizona market,

namely, the more than 3 million temporary nursing hours participating hospitals purchase through the Registry each year. Agencies that left the Registry Program have reported sharp declines in their overall sales.

61. To maintain agency bill rates below competitive levels, AzHHA has monitored participating hospitals' use of nonparticipating nurse staffing agencies and directed hospitals to increase their purchases of temporary nursing services through the Registry using the collectively determined, depressed bill rates. For instance, in March 2000, an AzHHA representative warned hospitals that "[t]he more that non-contract agency usage increases, the less powerful our contract becomes because agencies will drop and follow suit with 'higher bill rate' agencies. The final result would be the Registry Program ceasing to exist."

62. As a result of the Registry's lowering bill rates paid to nurse staffing agencies, those agencies have paid temporary nurses lower wages. Thus temporary nurses hired through the Registry have earned a lower hourly wage rate than temporary nurses not hired through the Registry.

63. The low agency bill rates imposed by AzHHA and resulting lower wages have reduced agencies' ability to recruit temporary nurses. The Registry's reduced agency bill rates and the resulting lower temporary nurse wages likely have distorted the incentives of hospitals and nurses, with significant long-run adverse consequences to the overall supply and mix of nursing services in Arizona.

64. The AzHHA Registry's downward effect on agency bill rates and nursing personnel wages has not resulted from efficiency-enhancing behavior.

65. The transactional efficiencies and scale economies AzHHA claims the Registry has generated do not account for, nor are they produced by, the lower bill rates the Registry has imposed on participating agencies. Some transactional efficiencies may have accrued to participating agencies because they can deal with most of the market through a single contact. But the anticompetitive effects of the AzHHA Registry have substantially outweighed any potential transactional efficiencies that have accrued to the temporary nursing agencies.

66. The Registry also has not created significant economies of scale accruing to agencies because those agencies have not obtained appreciable per unit reductions in cost because of their participation in the AzHHA Registry, much less as a result of the Registry's collective rate setting. The Registry has not resulted in an increase in the supply of temporary nurses in Arizona.

67. AzHHA's imposition of uniform rate schedules and other competitively sensitive contract terms was not reasonably necessary to achieve any efficiencies that may have resulted from the Registry's credentialing and quality-assurance activities. AzHHA conducted its quality-assurance activities for nearly a decade before it began setting uniform bill rates. Its adoption of uniform rate schedules starting in 1997 did not relate to the Registry's quality-assurance process. In November 2006, AzHHA ceased imposing uniform agency bill rates through the Per Diem Registry while maintaining the same quality-assurance activities, which reconfirmed that uniform pricing is not reasonably necessary to achieve the Registry's quality-assurance goals.

## XI. Violations Alleged

68. AzHHA, the AzHHA Service Corporation, and AzHHA's participating member hospitals, acting through the AzHHA Registry Program, agreed to fix certain terms and conditions relating to the purchase of temporary nursing personnel, including temporary nurse staffing agency bill rates.

69. The agreement among AzHHA, the AzHHA Service Corporation, and AzHHA's participating member hospitals, acting through the AzHHA Registry Program, has caused and continues to cause:

   i. a reduction in competition for hospitals' purchases of per diem nursing services in and around Phoenix, Arizona, and accompanying reductions in bill rates paid to temporary nursing agencies and wages paid to per diem nurses in that area;

   ii. a reduction in competition for hospitals' purchases of per diem nursing services in and around Tucson, Arizona, and accompanying reductions in bill rates paid to temporary nursing agencies and wages paid to per diem nurses in that area;

      iii.    a reduction in competition for Arizona hospitals' purchases of services provided by travel nurses, and accompanying reductions in bill rates paid to temporary nursing agencies and wages paid to travel nurses in the state; and,

in view of these effects, Defendants' actions have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402.

## XII. Request for Relief

70.    To remedy the violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402, alleged herein, the United States and the State of Arizona request that the Court:

      i.    adjudge the Defendants AzHHA and AzHHA Service Corporation as constituting and having engaged in an unlawful combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402;

      ii.    order that the Defendants AzHHA and AzHHA Service Corporation, their officers, directors, agents, employees, and successors, and all others acting or claiming to act on their behalf, be permanently enjoined from engaging in, carrying out, renewing, or attempting to engage in, carry out, or renew the combination and conspiracy alleged herein or any other combination or conspiracy having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 44-1402 of Arizona's Uniform State Antitrust Act, A.R.S. § 44-1402;

      iii.    award costs of this action; and

      iv.    such other and further relief as may be required and the Court may deem just and proper.

Dated: May 22, 2007

THOMAS O. BARNETT
Assistant Attorney General
Antitrust Division

J. ROBERT KRAMER II
Director of Operations
Antitrust Division

JOSEPH M. MILLER
Acting Chief, Litigation I Section
Antitrust Division

RYAN DANKS
STEVEN KRAMER
SETH A. GROSSMAN
REBECCA PERLMUTTER

Attorneys
Litigation I Section
United States Department of Justice
Antitrust Division
1401 H Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 305-0128
Facsimile: (202) 307-5802

TERRY GODDARD, Attorney General
NANCY BONNELL, Antitrust Unit Chief
(Arizona Bar #016382)
Consumer Protection and Advocacy Section
Department of Law Building, Room #259
1275 West Washington Street
Phoenix, AZ 85007
Telephone: (602) 542-7728
Facsimile (602) 542-9088

CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nancy Bonnell, Antitrust Unit Chief, ID #016382
Consumer Protection and Advocacy Section
Department of Law Building, Room #259
1275 West Washington Street
Phoenix, AZ 85007-2997
(602) 542-7728
   Attorney for the State of Arizona

Andrew S. Gordon
Coppersmith Gordon Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1000
Phoenix, AZ 85004
(602) 381-5460
Facsimile: (602) 224-6020
   Attorney for the Defendants

_____
United States Department of Justice
Antitrust Division